PT/AAS:DGR
F. #2014R00231

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

LILAAHAR BICAL
    also known as "Sammy," and
DARMIN BACHU,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. <u>16-CR-555 (LDH)</u>

 

**MEMORANDUM OF LAW IN SUPPORT
OF THE GOVERNMENT'S MOTIONS IN LIMINE**

 

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Drew G. Rolle
Assistant U.S. Attorney
    (Of Counsel)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... 1

BACKGROUND .......................................................................................................... 1

ARGUMENT ............................................................................................................... 3

I. THE COURT SHOULD LIMIT THE EVIDENCE THE DEFENDANTS MAY OFFER CONCERNING MATERIALITY AND PRECLUDE THE DEFENDANTS FROM ELICITING OPINION TESTIMONY AS TO THE MATERIALITY OF THEIR MISREPRESENTATIONS ................................................................................... 3

    A. Relevant Facts .......................................................................................... 4

    B. Legal Standard ......................................................................................... 4

    C. Argument ................................................................................................. 7

II. EVIDENCE OF BOTH BICAL'S PLAN FOR USING THE GM FUNDS AND OF THE DEFENDANTS' FABRICATION OF OTHER DOCUMENTS TO SUBMIT TO GM ARE DIRECT EVIDENCE OF THE CHARGED FRAUDULENT SCHEME AND ADMISSIBLE UNDER RULE 404(B) ............................................................... 10

    A. Relevant Facts ........................................................................................ 10

    B. Legal Standard ....................................................................................... 13

    C. Argument ............................................................................................... 15

III. ███████████████████████████████████████████████
███████████████████████████████ .................................................. 21

IV. THE COURT SHOULD PRECLUDE ANY TESTIMONY OR ARGUMENT AS TO THE COLLATERAL CONSEQUENCES OF A CONVICTION FOR EITHER DEFENDANT ........................................................................................................ 23

CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

Shannon v. United States, 512 U.S. 573, 579 (1994) ................................................ 23

United States v. Abdallah, 840 F. Supp. 2d 584, 608 (E.D.N.Y. 2012) ......................... 8

United States v. Autuori, 212 F.3d 105, 115 (2d Cir. 2000) ....................................... 5

███████████████████████████████████████████████████

United States v. Benedetto, 571 F.2d 1246, 1248 (2d Cir. 1978) ............................... 14

United States v. Blume, 967 F.2d 45, 49 (2d Cir. 1992) ........................................... 24

United States v. Cadet, 664 F.3d 27, 32 (2d Cir. 2011) ...................................... 14, 15

United States v. Campbell, 142 F. Supp. 3d 298, 300–01 (E.D.N.Y. 2015) ................. 15

United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) ................................... 13, 16

United States v. Carlton, 534 F.3d 97, 101 (2d Cir. 2008) ....................................... 14

United States v. Carpenter, 791 F.2d 1024, 1035 (2d Cir. 1986) ................................ 8

United States v. Collins, 581 F. App'x 59, 60 (2d Cir. 2014) ................................ 9, 10

United States v. Corsey, 723 F.3d 366, 373 (2d Cir. 2013) ................................. 5, 6, 7

United States v. DiMarzo, 80 F.3d 656, 660 (1st Cir. 1996) ..................................... 24

United States v. Edwards, 631 F.2d 1049, 1051 (2d Cir. 1980) ................................ 23

United States v. Finazzo, 850 F.3d 94, 106 (2d Cir. 2017) ........................................ 5

United States v. Fiumano, No. 14-CR-518 (JFK), 2016 WL 1629356, at *3 (S.D.N.Y. Apr. 25, 2016) ................................................................................................... 13

United States v. Frenkel, --- F. App'x ---, 2017 WL 946727, at *1 (2d Cir. 2017) ........ 5

United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997) ................................... 13

United States v. Greenberg, 835 F.3d 295, 305 (2d Cir. 2016) ................................... 5

United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) ........................................... 13

United States v. Isola, 548 F. App'x 723, 725 (2d Cir. 2013) ..................................... 6

United States v. Jafari, 663 F. App'x 18, 20–21 (2d Cir. 2016) ................................ 13

United States v. Kaplan, 490 F.3d 110, 118 (2d Cir. 2007) ....................................... 6

United States v. Lewis, 110 F.3d 417, 422 (7th Cir. 1997) ...................................... 24

United States v. McCallum, 584 F.3d 471, 475 (2d Cir. 2009) .................................. 14

United States v. Mercado, 573 F.3d 138, 142 (2d Cir. 2009) .............................. 20, 21

United States v. Mingo, 76 F. App'x 379, 382 (2d Cir. 2003) .................................. 19

United States v. Mittelstaedt, 31 F.3d 1208, 1217 (2d Cir. 1994) ............................... 5

United States v. Mohamed, 148 F. Supp. 3d 232, 241 (E.D.N.Y. 2015) ..................... 20

<u>United States v. Mostafa</u>, 16 F. Supp. 3d 236, 252 (S.D.N.Y. 2014) ............................................ 15

<u>United States v. Pascarella</u>, 84 F.3d 61, 69 (2d Cir. 1996) ........................................................ 14

<u>United States v. Pierce</u>, 224 F.3d 158, 166 (2d Cir. 2000) ..................................................... 5, 8

<u>United States v. Rea</u>, 958 F.2d 1206, 1215 (2d Cir. 1992) ...................................................... 7, 9

<u>United States v. Siddiqui</u>, 699 F.3d 690, 702 (2d Cir. 2012) ..................................................... 17

<u>United States v. Thomas</u>, 116 F.3d 606, 614 (2d Cir. 1997) ..................................................... 23

<u>United States v. Thomas</u>, 377 F.3d 232, 242 (2d Cir. 2004) ..................................................... 6

<u>United States v. Trapilo</u>, 130 F.3d 547, 552 (2d Cir. 1997) ...................................................... 8

<u>United States v. Watts</u>, 934 F. Supp. 2d 451, 464–65 (E.D.N.Y. 2013) ....................................... 24

**<u>Other Authorities</u>**

Sand et al., <u>Modern Federal Jury Instructions</u>, Instruction 9-1 (2016 ed.) .................................. 23

**<u>Rules</u>**

Fed. R. Evid. 403 ......................................................................................................................... 23

Fed. R. Evid. 701 ........................................................................................................................... 6

## PRELIMINARY STATEMENT

The government respectfully submits this motion to request the Court issue pre-trial <u>in limine</u> rulings: (1) precluding the defendants from eliciting opinion testimony about whether the defendants' misrepresentations were "material"; (2) admitting certain other acts as direct evidence of the charged fraud scheme or, alternatively, pursuant to Rule 404(b) of the Federal Rules of Criminal Procedure; (3) █████████████████████████████ ████████████████████████████████████████████ ████████████ and (4) precluding the defendants from making reference to or argument about the collateral consequences of their potential convictions.

## BACKGROUND

The above-captioned indictment (the "Indictment") charges Lilaahar Bical, also known as "Sammy," and Darmin Bachu with engaging in a scheme to defraud General Motors Company LLC ("GM") out of $15 million. (Indictment, ECF No. 1.) At the time, Bical was the owner of Kristal Auto Mall, an authorized GM dealership in Brooklyn, New York. (<u>Id.</u> ¶ 2.) Since at least 2011, Bical had been in negotiations with GM to build the new dealership on land in the Mill Basin section of Brooklyn (the "Mill Basin Property"). (<u>Id.</u> ¶ 4.) Bical was negotiating with GM for up to $15 million in funding (the "GM funding") to help Bical build a new dealership at the Mill Basin Property. (<u>Id.</u>)

At the time, the New York City Economic Development Corporation ("EDC") controlled the Mill Basin Property. (<u>Id.</u> ¶ 2.) Bical had been negotiating with the EDC since 2004 to secure control of the Mill Basin Property, as gaining control of that property was necessary to Bical's plan to relocate his GM dealership there. (<u>Id.</u> ¶¶ 2–5.) During their negotiations, GM informed Bical that any GM funding would be contingent on Bical successfully acquiring control of the Mill Basin Property from the EDC. (<u>Id.</u> ¶ 4.)

The government expects the evidence at trial will detail the issues GM raised during the negotiations that needed to be resolved before it would proceed with the deal. One such issue was that GM required and expected "total transparency" from a dealer in order to protect GM's investment. Thus, one of the biggest issues GM raised internally during its negotiations with Bical was the lack of visibility GM had into the terms under which Bical would gain control of the Mill Basin Property. GM sought information related to that issue, including information about the source of funds Bical would use to purchase the property and the amount of debt service on the property.

As part of GM's effort to obtain the transparency it needed, GM directed Bical to provide all financial and business records pertaining to his acquisition of the Mill Basin Property. (Id. ¶¶ 4–6.) Bical, however, had other plans. As he explained in phone calls intercepted by law enforcement pursuant to a judicially authorized wiretap, Bical did not want GM to "know his business," and he wanted to obtain the GM funding without disclosing the information GM sought. (Id. ¶ 6.) As he stated to Bachu on February 24, 2012, Bical had falsely told GM he had a non-disclosure agreement ("NDA") with the EDC that would not allow him to provide GM with the information it sought. (Id.)

In fact, Bical had no such NDA, but having made that representation to GM, he enlisted Bachu to help fabricate a fictitious NDA to provide to GM. (Id.) In a recorded call, Bachu confirmed they would "make one [NDA] up right away," which he would send to Bical's email account. (Id. ¶¶ 6–7.) On or about February 28, 2012, Bical showed GM representatives a copy of the false NDA. (Id. ¶ 9.)

Thereafter, GM mailed Bical a "Letter of Intent," which listed terms of any continued negotiations with Bical. (Id. ¶ 10.) Among the terms was a requirement that Bical

provide GM with access to documents, including all financial and business records related to the acquisition of the Mill Basin Property and the construction of the dealership.  (Id.)  On March 27, 2012, Federal Bureau of Investigation ("FBI") special agents met with Bical and asked about his efforts to obtain the GM funding.  (Id. ¶ 11.)  Bical told the agents he did not believe he had an NDA with the EDC and, after hearing his recorded conversation with Bical about the false NDA, stated that he did not want GM to "know his business."  (Id.)  Ultimately, after being informed of Bical and Bachu's scheme, GM chose not to provide the GM funding to Bical.  (Id. ¶ 12.)

On October 25, 2016, a grand jury returned an indictment charging Bical and Bachu with one count of attempt and conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, one count of mail fraud, in violation of 18 U.S.C. § 1341, and one count of wire fraud, in violation of 18 U.S.C. § 1343.

## ARGUMENT

## I.   THE COURT SHOULD LIMIT THE EVIDENCE THE DEFENDANTS MAY OFFER CONCERNING MATERIALITY AND PRECLUDE THE DEFENDANTS FROM ELICITING OPINION TESTIMONY AS TO THE MATERIALITY OF THEIR MISREPRESENTATIONS

Based on defense counsel's representations, the government expects that the defendants may seek to elicit opinion testimony that Bical's misrepresentations to GM were immaterial because, irrespective of the defendants' misrepresentations, GM would have ultimately learned the truth about Bical's terms with the EDC for controlling the Mill Basin Property through due diligence GM would have performed before agreeing to provide the GM funding.  For the reasons set forth below, the government moves the Court to (1) exclude as irrelevant any testimony or argument that due diligence would have discovered the truth despite the defendants' misrepresentations; and (2) preclude the defendants from offering opinion testimony about whether the defendants' misrepresentations were material.

A.    Relevant Facts

As detailed in the Indictment, obtaining all relevant information concerning Bical's acquisition of the Mill Basin Property was an important factor in GM's decision about whether to provide the GM funding, such that GM would not provide it without obtaining all such relevant information.  To prove that allegation at trial, the government expects to call GM representatives involved in the contemplated transaction to testify about GM's process for handling dealer requests, like Bical's, for GM funds.  The government also expects that these GM witnesses will explain how GM needed transparency throughout the process in order to protect GM's potential investment.

As previously disclosed to the defendants, in January 2014, an attorney in GM's legal department—who was not personally involved in the negotiations with Bical—expressed the opinion that Bical's false representation that he had an NDA with the EDC and therefore could not provide the requested information about the financial terms of the deal with the EDC was not "material."  According to the GM attorney, before agreeing to lend or invest funds with Bical, GM would have performed additional due diligence regarding the terms of any agreement between Bical and the EDC, which would have revealed the information Bical was trying to hide from it.  The GM attorney opined that, because Bical's misrepresentations could not have succeeded in inducing GM to provide the GM funding without GM learning all of the information it needed, Bical's misrepresentations were not material.

B.    Legal Standard

1.    Materiality

The "essential elements" of the mail and wire fraud statutes "are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme."  United States v. Frenkel, --- F. App'x ---, 2017 WL 946727, at *1 (2d Cir.

2017) (quoting United States v. Greenberg, 835 F.3d 295, 305 (2d Cir. 2016)).  "[T]he statute is

interpreted to criminalize any scheme or artifice for obtaining money or property," United States

v. Finazzo, 850 F.3d 94, 106 (2d Cir. 2017), and it "punishes the scheme, not its success," United

States v. Pierce, 224 F.3d 158, 166 (2d Cir. 2000) (emphasis in original).  As a result, "to

establish a scheme to defraud . . . the prosecution need not show that the scheme in fact resulted

or would have resulted in a loss to the person who is the target of the plan."  Pierce, 224 F.3d at

166.

        The government may also prove a criminal scheme by establishing that the

defendant, through his or her scheme, intended to deprive the victim of intangible property

including the victim's interest in controlling his or her assets. See Finazzo, 850 F.3d at 112.  On

this "right to control" theory of liability, a defendant violates the statute by making false

representations or omissions that "deprive the victim of potentially valuable economic

information."  Id. (citations and internal quotation marks omitted).  In the context of an omission,

"the information withheld either must be of some independent value or must bear on the ultimate

value of the transaction."  United States v. Mittelstaedt, 31 F.3d 1208, 1217 (2d Cir. 1994).

        Importantly, "[i]n proving the first element of wire fraud (a scheme to defraud),

the government must prove that the misrepresentations at issue were material."  Frenkel, --- F.

App'x at ---, 2017 WL 946727, at *2 (citing United States v. Autuori, 212 F.3d 105, 115 (2d Cir.

2000)).  Indeed, "a lie can support a fraud conviction only if it is material, that is, if it would

affect a reasonable person's evaluation of a proposal."  United States v. Corsey, 723 F.3d 366,

373 (2d Cir. 2013).  Under the mail and wire fraud statutes, misrepresentations must be viewed

from the viewpoint of an ordinary, reasonable person.  See Frenkel, --- F. App'x at ---, 2017 WL

946727, at *2; <u>United States v. Thomas</u>, 377 F.3d 232, 242 (2d Cir. 2004).  A lie is material "if it would affect a reasonable person's evaluation of a proposal."  <u>Corsey</u>, 723 F.3d at 373.

"The role of the ordinary prudence and comprehension standard is to assure that the defendant's conduct was calculated to deceive, not to grant permission to take advantage of the stupid or careless."  <u>Thomas</u>, 377 F.3d at 242.  To that end, the objective ordinary prudence standard "focuses on the violator, not the victim."  <u>Id.</u> at 243.  Accordingly, the victim's views on, or response to the false representation are irrelevant.  <u>See</u> <u>United States v. Isola</u>, 548 F. App'x 723, 725 (2d Cir. 2013) ("[E]vidence of a particular [victim's] unreasonableness is irrelevant to the materiality of [the defendant's] false statements because materiality is an objective question."); <u>Thomas</u>, 377 F.3d at 243 ("We refuse to accept the notion that the legality of a defendant's conduct would depend on his fortuitous choice of a gullible victim." (citation and internal quotation marks omitted)).

2.    <u>Lay Opinion</u>

Under Rule 701 of the Federal Rules of Evidence, a court has discretion to admit lay opinion testimony.  <u>See</u> Fed. R. Evid. 701.  "[T]o ensure that lay opinion testimony is reliable and does not usurp the jury's role as fact-finder, Rule 701 imposes certain foundation requirements that must be satisfied if such testimony is to be admitted."  <u>United States v. Kaplan</u>, 490 F.3d 110, 118 (2d Cir. 2007).  Specifically, Rule 701 requires the lay opinion be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.

The "rational basis" requirement ensures that the witness has "first-hand knowledge or observation," <u>Kaplan</u>, 490 F.3d at 118, and the "helpfulness requirement is designed to provide 'assurance[ ] against the admission of opinions which would merely tell the

jury what result to reach,'" United States v. Rea, 958 F.2d 1206, 1215 (2d Cir. 1992) (alteration in original) (quoting Advisory Comm. Notes to Fed. R. Evid. 704). "[I]f attempts are made to introduce meaningless assertions which amount to little more than choosing up sides, exclusion for lack of helpfulness is called for by [Rule 701]." Rea, 958 F.2d at 1215–16 (second alteration in original) (citations and internal quotation marks omitted).

  C.  <u>Argument</u>

    1.  <u>The Defendants Cannot Present Evidence of GM's Due Diligence Processes To Establish a Lack of Materiality</u>

  While evidence of GM's due diligence process in dealer funding transactions may be relevant to give context to the negotiations between the parties and to show what was important to GM, the Court should preclude any effort by the defendants to use evidence of GM's due diligence process to argue that their misrepresentations were not material because GM would have discovered their falsity through the exercise of due diligence.

  The fact that GM would have performed due diligence that would have revealed the information the defendants sought to keep GM from learning is irrelevant to the materiality of the defendants' misrepresentations. As the Second Circuit explained in Corsey, a conspiracy to defraud either a gullible or sophisticated victim is completed the moment the defendant lies about a fact that would influence that victim's evaluation of the proposal. See Corsey, 723 F.3d at 373. Because it is the defendant's scheme that violates the mail and wire fraud statutes, "[t]he question is not whether victims might smell a rotten deal before they hand over money." Id. at 373 n.3. Instead, "a misrepresentation is material if it is capable of influencing the decisionmaker, no matter what the victim decides to do." Id.

  Here, consistent with the Second Circuit's explanation in Corsey, the defendants committed the charged conspiracy once they agreed to engage in a scheme to lie to GM by

crafting a false NDA to conceal information that was critical to GM's evaluation of whether to issue the GM funding to Bical. They committed the charged substantive offenses when, having devised that fraud scheme, they took acts from which it was reasonably foreseeable that mails or wires would be used. See United States v. Carpenter, 791 F.2d 1024, 1035 (2d Cir. 1986) ("It is sufficient that [the defendants] knew that the use of interstate mail and wire services was a reasonably foreseeable consequence of the scheme."), aff'd, 484 U.S. 19 (1987).

This is true irrespective of whether the scheme was destined to succeed or would otherwise have been uncovered by GM. Pierce, 224 F.3d at 166 ("[The wire fraud statute] punishes the scheme, not its success." (alteration in original) (quoting United States v. Trapilo, 130 F.3d 547, 552 (2d Cir. 1997))); United States v. Abdallah, 840 F. Supp. 2d 584, 608 (E.D.N.Y. 2012) ("The government does not need to prove that the scheme successfully defrauded the intended victim, but the government must show that some actual harm or injury was contemplated by the schemer." (citation and internal quotation marks omitted)), aff'd, 528 F. App'x 79 (2d Cir. 2013). As a result, the Court should preclude the defendants from offering evidence or argument that the defendants' representations to GM were not material because GM's due diligence would have ultimately uncovered the falsity of those representations.

2. Lay Opinion Testimony About the Materiality of the Defendants' Representations Should be Excluded

Similarly, the defendants should not be permitted to offer lay opinion testimony, from GM lawyers or anyone else, about whether, in the witness's opinion, the defendants' misrepresentations were material, as such opinion is unhelpful to the jury's determination of the facts and risks usurping the jury's role. The issues presented at trial will be within the comprehension of the jury, and lay opinion on this issue is unnecessary. The deal itself was straightforward: Bical wanted to build a new dealership on the Mill Basin Property and wanted

GM's help funding it.  GM's position was also straightforward: before agreeing to give Bical funding, they wanted to know all the details about how Bical would acquire control of the Mill Basin Property, including the price, and GM worked to assess the project's risks.

The jury will be more than capable of assessing the importance of the information sought by GM and concealed by the defendants' representations about the false NDA, and of determining whether the defendants' misrepresentations were material to GM's decisionmaking process.  In this context lay opinion is unhelpful and would be an attempt to tell the jury what result to reach.  See United States v. Collins, 581 F. App'x 59, 60 (2d Cir. 2014) ("An opinion is unhelpful and therefore may not be received in evidence if, for example, the testimony would merely recapitulate aspects of the evidence that the jury can already perceive on its own [or] the testimony 'would merely tell the jury what result to reach . . . .'" (internal citations omitted)).

Of course, the defendants should be permitted to offer or elicit testimony from lay witnesses about the significance GM placed on a particular piece of information during its contemplated deal with Bical.  Such witnesses could properly testify about whether and how land acquisition transparency, or the defendants' refusal to provide GM with that transparency, was important to GM in its decision whether or not to provide GM Funding.  But, as discussed above, such witnesses should not be permitted to testify about whether, in their lay opinion, the defendants' misrepresentations were material.  Such an opinion would "amount to little more than choosing up sides" on the issue of materiality.[1]  See Rea, 958 F.2d at 1216.  The defendants

---

[1]       An opinion that the misrepresentations were not material because GM would have discovered the truth anyway is also inadmissible for the same reasons stated above regarding the impropriety of arguments that the defendants' misrepresentations were immaterial because due diligence would have uncovered them before GM provided the GM funding.  The question is not whether the defendants would have succeeded in their scheme to defraud through false representations or concealment, only that they intended to engage in the scheme.  As a result, permitting the jury to consider such an opinion risks confusing the issues they must resolve, and should also be precluded under Rule 403.

should be required to make those arguments to the jury.  See Collins, 581 F. App'x at 60

(affirming the exclusion of opinion testimony about the materiality of an undisclosed agreement

where "fact witnesses proved sufficient for [the defendant]'s counsel to present the defense view

of the [agreement's] materiality").

## II.     EVIDENCE OF BOTH BICAL'S PLAN FOR USING THE GM FUNDS AND OF THE DEFENDANTS' FABRICATION OF OTHER DOCUMENTS TO SUBMIT TO GM ARE DIRECT EVIDENCE OF THE CHARGED FRAUDULENT SCHEME AND ADMISSIBLE UNDER RULE 404(B)

### A.     Relevant Facts

#### 1.     Bical's Construction Billing Plan Involving the GM Funds

Two weeks after showing the false NDA to a GM representative, Bical made

multiple phone calls to an associate (the "Associate").  Pursuant to a judicially authorized

wiretap, Bical's telephone conversations with the Associate on March 12, 2012 and March 13,

2012 were intercepted by law enforcement.[2]

During these calls, Bical and the Associate discussed forming a "corporation"

through which Bical and the Associate would bill GM for construction work done at the Mill

Basin Property.  In their initial conversation, Bical told the Associate that "[f]or Flatbush

Avenue" there would be "like 30–40 million . . . pass[ing] through there," and, as Bical

explained, "whatever [was] extra," the Associate would "just write the check back to [Bical]."

(Ex. 1-T at 2.)  Bical also complained about GM in his conversations with the Associate.  On

March 12, 2012, Bical complained to the Associate that "GM wants me to show them that, you

know, every dollar."  (Ex. 2-T at 1.)  As Bical stated he did not "understand" GM's position and

complained, "[t]hey want to see every dollar on this thing.  Okay.  Fuck them.  No." (Id. at 2.)

---

[2]  Electronic copies of these calls, have been provided to the Court on a compact disc as Exhibits 1 through 3.  Draft transcripts of those calls are attached hereto as Exhibits 1-T through 3-T.

On March 13, 2012, Bical and the Associate discussed their intent to "[f]orm a corporation" and to "do it right." (Ex. 3-T at 2.) Bical explained that the Associate would "be the . . . primary of the corporation," which, according to Bical, would allow them to "bill everything passing through there." (Id.) Bical was explicit about his reasoning and his concerns about GM, stating that with that structure "if GM ever does an audit, I don't want it to come back to me, you know?" (Id. at 3.) Regarding GM, Bical stated that with the plan he and the Associate were discussing, they could "fuck them right back." (Id.)

2.  Bical and Bachu's False and Fictitious Lease Agreement

In addition to creating a false and fictitious NDA to deceive GM into providing the GM funding without complete information, the defendants also worked together to create a false "lease letter" to provide to GM. As recorded during phone calls on March 1, 2012, which were intercepted pursuant to a judicially authorized wiretap, Bical and Bachu worked to craft a letter that would make it appear to GM that other purchasers were eager to lease the Mill Basin Property from Bical, which would stymie GM's plans to build a new dealership there with Bical.[3] Bical planned to use the letter to falsely claim that Bachu represented two institutional clients who were interested in using the Mill Basin Property.

In fact, however, Bachu did not represent any clients who wanted to use the Mill Basin property. In intercepted calls, Bical specified the falsehoods he wanted the letter to include. Those included that Bachu's "clients" had met with Bical and wanted to execute a $110,000 per month lease, with annual 5% rent increases. As Bical made clear, he wanted "to

---

[3] Electronic copies of these March 1, 2012 calls have been provided to the Court on a compact disc as Exhibits 4 through 6. Draft transcripts of those calls have been attached hereto as Exhibits 4-T through 6-T.

give GM an impression" that he had multiple people asking him to develop the property because, as he explained to Bachu, GM was "dragging their feet to do the deal."  (Ex. 4-T at 2.)

Later that day, Bachu called Bical and obtained the address to send Bical the false prospective lease letter they had discussed earlier.  (Ex. 6-T.)  During that call, after Bachu asked whom the letter should list as his client, the prospective lessee, Bical stated "[Y]ou're gonna make up somebody.  You are gonna say that's your client."  (Id. at 3.)  Bical stated that the letter should reference and hint that restaurants such as Red Lobster and Olive Garden wanted to lease the property.  (Id. at 4.)  Bical further reminded Bachu, "remember, you represent them [the restaurants], not me."  (Id.)

### 3. Bical's Attempt to Procure a False NDA From Another Lawyer

While Bical was negotiating with GM, he not only sought the false NDA from Darmin Bachu, but also from another lawyer who worked with Bical (the "Lawyer").  In a telephone call intercepted pursuant to a judicially authorized wiretap on February 24, 2012—the same day Bical asked Bachu for the false NDA—Bical requested the same service from the Lawyer.[4]  (Ex. 7-T.)

In that call, Bical explained the prospective GM deal and his need for a false and fictitious NDA.  Bical explained that GM wanted "to get all the details" including "how long [Bical had] been doing" the Mill Basin Property transaction.  As he articulated, "I just don't want to discuss all of that."  Bical admitted to the Lawyer that when GM had asked him for information, Bical told GM "No. I can't give it to you . . . . [b]ecause I said I signed a letter of confidentiality with, uhm, [the] City."  (Id. at 2–3 (internal quotation marks omitted).)  As a

---

[4]	An electronic copy of this February 24, 2012 call has been provided to the Court on a compact disc as Exhibits 7.  A draft transcript of the call is attached hereto as Exhibit 7-T.

result, Bical felt he had to "live up to [his] end of the bargain," and wanted to "see if [he] c[ould] show them a copy of the letter." (Id. at 3.) Minutes after this call with the Lawyer, Bical called Bachu to request the same false NDA.

B.    Legal Standard

Evidence of an uncharged act is admissible at trial where (1) "it arose out of the same transaction or series of transactions as the charged offense," (2) "it is inextricably intertwined with the evidence regarding the charged offense," or "it is necessary to complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (citations and internal quotations omitted). Where evidence falls into one of these categories, it "is considered direct evidence and Rule 404 is not applicable." United States v. Fiumano, No. 14-CR-518 (JFK), 2016 WL 1629356, at *3 (S.D.N.Y. Apr. 25, 2016).

Accordingly, uncharged acts may constitute direct evidence of the charged crime in a wide variety of contexts. For example, where, as here, the government alleges there was a conspiracy, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994) (second alteration in original) (quoting United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992)). Additionally, where other act evidence would serve to "demonstrat[e] the context of certain events relevant to the charged offense," it is admissible to complete the story of the crimes charged. See United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994); United States v. Jafari, 663 F. App'x 18, 20–21 (2d Cir. 2016) (finding evidence of uncharged fraudulent billing statements were "properly admitted to provide jurors with a complete account of the fraud scheme" (internal citations omitted)); United States v. Gonzalez, 110 F.3d 936, 942 (2d Cir. 1997) (finding that the other act

evidence "provide[d] crucial background evidence that gave coherence to the basic sequence of events that occurred" during the charged crime).

Even where other act evidence is not direct evidence of the crime, Rule 404(b) permits its admission in numerous circumstances. Pursuant to Rule 404(b) of the Federal Rules of Evidence, evidence of a defendant's uncharged acts is admissible at trial where the evidence (1) is "offered for a proper purpose;" (2) is "relevant to a disputed issue;" and (3) has probative value that is not "substantially outweighed by its potential for unfair prejudice pursuant to Rule 403." See United States v. McCallum, 584 F.3d 471, 475 (2d Cir. 2009). The Second Circuit has repeatedly stated that it "follows the 'inclusionary' approach to 'other crimes, wrongs, or acts' evidence, under which such evidence is admissible unless it is introduced for the sole purpose of showing the defendant's bad character, or unless it is overly prejudicial under [Rule] 403 or not relevant under [Rule] 402." United States v. Carlton, 534 F.3d 97, 101 (2d Cir. 2008) (quoting United States v. Pascarella, 84 F.3d 61, 69 (2d Cir. 1996)); see United States v. Benedetto, 571 F.2d 1246, 1248 (2d Cir. 1978) (noting that the Circuit has "long been committed to the 'inclusionary' approach to 'other crimes' evidence").

Rule 404(b) sets out a non-exclusive list of purposes for which other act evidence may be offered, including "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). "When 'other act' evidence is offered to show knowledge or intent in particular, as opposed to other non-propensity purposes such as proof of identity or corroboration of witnesses, such evidence must be 'sufficiently similar to the conduct at issue' to permit the jury to draw a reasonable inference of knowledge or intent from the other act." United States v. Cadet, 664 F.3d 27, 32 (2d Cir. 2011). "The similarity or connection between the charged crime and the prior event goes to the question of

relevance." United States v. Mostafa, 16 F. Supp. 3d 236, 252 (S.D.N.Y. 2014). To be admissible as evidence of intent or knowledge, "[t]he other act 'need not be identical to the charged conduct,' just 'sufficiently similar' to support the state-of-mind inference." United States v. Campbell, 142 F. Supp. 3d 298, 300–01 (E.D.N.Y. 2015) (quoting Cadet, 664 F.3d at 32–33).

C.    Argument

For the reasons discussed below, the Court should admit evidence of (1) Bical's discussions with the Associate, (2) Bical and Bachu's creation of the false lease letter, and (3) Bical's attempt to obtain the NDA from the Lawyer, all as direct evidence of the charged fraud and, alternatively, as other act evidence under Rule 404(b).

1.    The Discussions with the Associate, Creation of the False Lease Letter, and Attempt to Obtain the NDA from the Lawyer are Direct Evidence of the Charged Fraudulent Scheme

At the core of the charged fraudulent scheme is Bical's intent to secure the GM funding by any means necessary, including concealing critical information from GM. Bical's discussions with the Associate, the defendants' creation of the False Lease Letter, and Bical's attempt to obtain the NDA from the Lawyer all help complete the story of that fraudulent scheme and are admissible as direct evidence of the scheme.

As to evidence of Bical's discussions with the Associate, those discussions concerned the same GM funding Bical hoped to obtain using the charged misrepresentations. As Bical complained to the Associate, GM wanted Bical to "show them . . . . every dollar," and Bical "just [didn't] understand"—his response: "Fuck them. No." (Ex. 2-T at 1.) These discussions and Bical's proposed plan with the Associate are "crucial background evidence that g[i]ve[s] coherence to the basic sequence of events" at issue in this case. See Gonzalez, 110 F.3d at 942. As such, it is direct evidence of the charged fraudulent scheme.

Similarly, the false lease letter is also part of the story of Bical's negotiations to obtain the GM funding, and helps complete the story of the charged crime for the jury. As Bical explained to Bachu when he requested the false lease letter, Bical felt that GM was moving too slowly, notwithstanding the fake NDA Bical provided to GM approximately a week earlier. From the defendants' perspective, the longer GM waited to approve funding, the greater the risk GM would continue probing Bical for the information he did not want to disclose to GM.

At trial, the jury will hear about the scheme defendants employed to help close the GM deal without providing the transparency GM made clear it needed. The false NDA was a critical piece in that scheme, and the defendants' use of the false lease letter to apply additional pressure on GM to close the deal was a critical second piece. As such, evidence about the defendants' creation of the false lease letter completes the story of the crime on trial and it should be admitted as direct proof of the defendants' scheme. See Gonzalez, 110 F.3d at 942.

Likewise, Bical's attempt to procure the false NDA from the Lawyer is also direct evidence of the charged fraudulent scheme. First, because Bical's request for a false NDA from the Lawyer occurred on the same day as Bical's request for the same document from Bachu, Bical's request to the Lawyer plainly completes the story of the crime on trial because it "arose out of the same transaction or series of transactions as the charged offense." See Carboni, 204 F.3d at 44. Second, this evidence also provides relevant context for the scheme on trial. Indeed, Bical's conversation with the Lawyer reveal the initial stages of the scheme to use a false NDA to conceal information GM sought.

Because evidence of Bical's discussions with the Associate, the creation of the false lease letter, and Bical's separate attempt to procure the NDA will all help complete the

story of the crime on trial, the Court should admit evidence of them as direct evidence of the charged fraudulent scheme.[5]

### 2. This Evidence is Also Admissible Under Rule 404(b) to Show the Defendants' Motive, Intent, Knowledge, and Lack of Mistake

Even if the Court does not find that this evidence was not direct evidence (which the government submits it should), such evidence should still be admitted under Rule 404(b).

### a. The Evidence is Probative of Motive, Intent, Knowledge and Lack of Mistake

At trial, the government must prove that the defendants knowingly and intentionally engaged in the scheme to defraud GM, which puts issues of knowledge and intent squarely before the jury. While not an element of the crime, the issue of the defendants' motive will be important at trial to give the jury "an explanation of _why_ the defendant[s] would engage in the charged conduct." United States v. Siddiqui, 699 F.3d 690, 702 (2d Cir. 2012) (emphasis in original).

Bical's discussions with the Associate and the Lawyer are particularly probative of Bical's motive to engage in the charged fraudulent scheme. Bical's conversation with the Associate provides the jury with a clear answer as to why Bical would decide to defraud a company he's partnered with for many years. His statements during those calls show the level of disdain Bical had for GM at the time of the charged fraud, including his frustration with GM's request for information. (Ex. 2-T at 1–2 ("They [GM] want to see every dollar on this thing").) Bical's conversations with the Associate also go to motive by demonstrating for the jury what Bical thought he had to gain by securing the funding through any means, including fraud.

---

[5] As discussed below, the balancing required under Rule 403 of the Federal Rules of Evidence weighs in favor of admitting this evidence, as it is not unduly prejudicial. See infra Section II.C.2.b.

Indeed, within two weeks of showing the false NDA to GM, Bical was in detailed discussions with the Associate as to how they would get GM "right back." (Ex. 3-T at 3.)

Evidence of Bical's attempt to obtain the NDA from the Lawyer also provides relevant insight into Bical's motive to engage in the charged criminal conduct. Specifically, Bical's comments to the Lawyer reveal his reasons for wanting to deceive GM. (See Ex. 7-T at 2 ("They wanna get all the details of how long I've been doing this. I just don't wanna discuss all of it. . . [T]heir deal is lending me the money based on, you know, he owns the real estate free and clear, got nothing to do with anything.").) As a result, evidence of Bical's discussions with the Associate and the Lawyer should be admitted as evidence of motive under Rule 404(b).

In addition to being relevant as to motive, Bical's communications with the Associate are also relevant to the issue of Bical's intent to conceal information from GM as charged in the Indictment. Specifically, Bical's discussions with the Associate show that Bical was aware that GM would scrutinize the minutia of his operations. They also show Bical's desire and willingness to evade GM's scrutiny, noting that through the proposed structure "if GM ever does an audit, I don't want it to come back to me." (Ex. 3-T at 3.)

The issues of knowledge and intent are also addressed by evidence of the false lease letter and Bical's request for the NDA from the Lawyer. First, the false lease letter illustrates Bical's continued efforts to falsify documents in connection with the GM transaction, and to use Bachu's services to further his efforts. This evidence underscores Bical's intent to deceive GM to secure the GM funding, and Bachu's intent to assist Bical in achieving that specific, criminal purpose. The creation of the false lease letter to mislead GM is also a direct parallel to the defendants' creation of the false NDA, which is at the core of the charged fraudulent scheme. As such, it is relevant and admissible under Rule 404(b). See United States

v. Mingo, 76 F. App'x 379, 382 (2d Cir. 2003) (finding the uncharged act of falsifying checks was a "necessary parallel" of the charged act of falsifying account statements because "in both circumstances, [the defendant] attempted to obtain money from banks by submitting falsified documents").

Furthermore, to the extent Bachu asserts at trial that he was an unknowing, good-faith actor who did not know what Bical planned to do with the NDA and was surprised that Bical showed GM a false NDA (an argument that is at odds with the recordings described in the Indictment in any event), evidence of the false lease letter is particularly relevant. In response to Bical's request for Bachu to draft a false lease letter, Bachu expressed no surprise, disbelief or concern to Bical. Instead, Bachu quickly agreed to do what Bical asked and then double-checked with Bical to confirm that Bachu was crafting the false lease letter in the manner Bical wanted. Bachu's lack of surprise at Bical's outlandish request is probative of what Bachu knew about Bical's conduct in the GM deal: he knew Bical was lying to GM.

Bical's attempt to obtain the NDA from the Lawyer also goes to the issue of intent and lack of mistake. By showing that Bical requested a false NDA from not one, but two lawyers, and expressed the same reasoning each time—not wanting to disclose information to GM—a jury can draw the inference that Bical was not misspeaking when he spoke to Bachu and requested the false NDA at issue. Bical's multiple attempts to obtain a false NDA also suggest that he intended to obtain one.[6]

---

[6]   Although Bachu was not a party to the conversation between Bical and the Lawyer, like he was not a party to the conversations between Bical and the Associate, any prejudicial effect on Bachu is minimal, and any such prejudice is eliminated through a limiting instruction. See United States v. Ozsusamlar, 428 F. Supp. 2d 161, 174 (S.D.N.Y. 2006) (citing United States v. Rosenwasser, 550 F.2d 806, 813–14 (2d Cir. 1977)).

b.      The Evidence Is Not Unduly Prejudicial

Applying the required balancing test under Rule 403, the probative value of Bical's discussions with the Associate, the creation of the false lease letter, and Bical's attempt to obtain the NDA from the Lawyer is not outweighed by unfair prejudice to the defendants.

As to evidence of Bical's discussions with the Associate, any prejudice arising that evidence is minimal, as these conversations are no more inflammatory than Bical's discussions with Bachu about fabricating documents in connection with the GM deal. Furthermore, because an understanding of Bical's motive is central to understanding the scheme in this case, the probative value of this evidence is great.  Thus, even if admitting this evidence was prejudicial, it is not unduly so.

Similarly, the lies involved in the false lease letter are no worse or more inflammatory than the defendants' lies about the false NDA referenced in the indictment.  See United States v. Mercado, 573 F.3d 138, 142 (2d Cir. 2009) (affirming Rule 403 assessment of other act evidence where the other acts were "not especially worse or shocking than the transactions charged"); United States v. Mohamed, 148 F. Supp. 3d 232, 241 (E.D.N.Y. 2015) (admitting other act evidence under Rule 404(b) and noting that the proffered "carjacking is considerably less inflammatory than the charged crimes").  Given the strong probative value of the false lease letter on the issues of the defendants' intent and knowledge, whatever minimal prejudice that admission of this evidence creates does not outweigh its probative value.

For the same reasons, evidence of Bical's attempt to obtain the NDA from the Lawyer does not create any undue prejudice. First, this evidence is largely the same as the evidence about the defendants' creation of the NDA and no more inflammatory.  Because the jury will already have familiarity with the defendant's lies to further the charged scheme, this additional

evidence will not be so "shocking" or surprising as to warrant exclusion of this evidence under Rule 403. See Mercado, 573 F.3d at 142.

Accordingly, because each piece of evidence is minimally prejudicial while being highly probative of the proper purposes under Rule 404(b), the Court should alternatively admit this evidence under Rule 404(b).

**III.**





██████████████████████████████

████████████████████████████

██████████████

## IV. THE COURT SHOULD PRECLUDE ANY TESTIMONY OR ARGUMENT AS TO THE COLLATERAL CONSEQUENCES OF A CONVICTION FOR EITHER DEFENDANT

"Irrelevant evidence is not admissible." Fed. R. Evid. 402. "[T]he district court has broad discretion to exclude evidence that is irrelevant . . . ." United States v. Edwards, 631 F.2d 1049, 1051 (2d Cir. 1980); see also Fed. R. Evid. 403. Juries are generally instructed not to consider a defendant's punishment in determining a defendant's guilt. See generally Sand et al., Modern Federal Jury Instructions, Instruction 9-1 (2016 ed.); see also Shannon v. United States, 512 U.S. 573, 579 (1994) (Juries "should be admonished to reach [a] verdict without regard to what sentence might be imposed [and to not] consider the consequences of their verdicts." (internal quotation marks omitted)). That is because guilt should determine punishment, not the other way around. The same is true regarding the potential consequences a defendant may face if convicted.

The collateral effects of a criminal conviction lack any "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." Fed. R. Evid. 401. As such, any evidence of those issues is irrelevant, and it "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." Shannon, 512 U.S. at 579; see also United States v. Thomas, 116 F.3d 606, 614 (2d Cir. 1997) ("Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court . . . We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent.").

23

Courts have therefore repeatedly precluded evidence of the potential sentences defendants face on the grounds that such evidence is irrelevant, unfairly prejudicial and outside the province of the jury.  See, e.g., United States v. Lewis, 110 F.3d 417, 422 (7th Cir. 1997) (holding that district court correctly refused to permit defendant to argue about the severity of his possible punishment); United States v. DiMarzo, 80 F.3d 656, 660 (1st Cir. 1996) (district court "soundly excluded" evidence of a potentially harsh sentence because such evidence "would have necessitated an unwarranted departure from the fundamental division of responsibilities between judge and jury"); cf. United States v. Blume, 967 F.2d 45, 49 (2d Cir. 1992) ("Federal courts usually instruct juries not to consider a verdict's consequences.").

Here, because the defendants' possible loss of professional licenses or franchising rights are irrelevant to the question of their guilt, the Court should preclude any evidence or argument concerning either.  See United States v. Watts, 934 F. Supp. 2d 451, 464–65 (E.D.N.Y. 2013) ("[I]t is well-established precedent that jurors should not be informed about the possible consequences of their verdict due to the likelihood that prejudice, unfairness, and confusion that would result.").

## CONCLUSION

For the reasons set forth above, the Court should grant the government's motions.

Dated:    Brooklyn, New York
          May 15, 2017

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York
Attorney for Plaintiff
271 Cadman Plaza East
Brooklyn, New York 11201

By:    /s/ Drew G. Rolle_____
       Drew G. Rolle
       Assistant United States Attorney
       (718) 254-6783