

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MKM:DGR  
F. #2014R000231

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 10, 2019

By ECF

The Honorable LaShann DeArcy Hall  
United States District Court  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

      Re:    United States v. Lilaahar Bical,  
               Criminal Docket No. 16-555 (LDH)

Dear Judge DeArcy Hall:

      The government respectfully submits this letter in advance of the defendant Lilaahar Bical's sentencing, which is currently scheduled for January 25, 2019 at 3:00 p.m. For the reasons set forth below, the government respectfully requests that the Court sentence Bical within the applicable U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range of 0 to 6 months. The government submits that such a sentence would be sufficient but not greater than necessary to comply with the sentencing scheme set forth in 18 U.S.C. § 3553(a).

I.     Background

      As described in the U.S. Probation Department's Pre-Sentence Report ("PSR") and the Indictment, Bical designed and executed a scheme to defraud General Motors Company LLC ("GM") out of millions of dollars. Being a successful GM car dealer was not enough for Bical. He wanted more from GM, and he was willing to lie to get it. As his admissions to the Court and execution of the scheme makes clear, Bical's crime was about one thing: greed.

      Bical was the owner of Kristal Auto Mall, an authorized GM dealership in Brooklyn, New York. (PSR ¶¶ 4–5.) Since at least 2011, Bical and GM had been negotiating to build a new car dealership on land in the Mill Basin section of Brooklyn (the "Mill Basin Property"). (PSR ¶ 7.) Bical was seeking funding of up to $15 million from

GM to assist in that project (the "GM funding"). (PSR ¶ 7; Bachu Trial Tr. 220.[1]) A backdrop to the negotiations was Bical's related negotiation with the New York City Economic Development Corporation (the "EDC") controlled the Mill Basin Property. (PSR ¶¶ 5–7; Bachu Trial Tr. 138.) Bical had been negotiating with the EDC since 2004 to secure control of the Mill Basin Property, as gaining control of that property was necessary to Bical's relocation plans. (PSR. ¶ 5; Bachu Trial Tr. 138, 221–22.)

In 2012, as Bical's negotiations with GM continued, Bical became a subject of an investigation by the Federal Bureau of Investigation ("FBI") into a then-sitting New York State Senator. In the course of that investigation, the FBI obtained a judicially-authorized wiretap of Bical's telephone. It was through that wiretap, in part, that the FBI uncovered Bical's efforts to defraud GM by attempting use a fictitious non-disclosure agreement to hide material information from GM in the course of their negotiations over the GM funding.

The scheme centered on Bical's desire to obtain the GM funding without telling GM all details about the acquisition of the Mill Basin Property as required. (PSR ¶ 9.) Given the high-priced real estate market in which the dealership would be built, GM needed to ensure there would be long-term control of the underlying property. (Bachu Trial Tr. 70–73, 78–80.) During their negotiations in 2011 and 2012, GM had informed Bical that the GM funding would be contingent on Bical successfully acquiring control of the Mill Basin Property from the EDC. (PSR ¶¶ 7–9; Bachu Trial Tr. 70–73, 78–80.) In addition, GM would require complete "transparency" from Bical concerning the property's acquisition and control so that GM could understand every aspect of the transaction and ensure GM would be able to maintain "site control" of the future dealership. (Bachu Trial Tr. 226–27.) As part of GM's effort to get sufficient information from Bical, GM directed Bical to provide all financial and business records pertaining to his acquisition of the Mill Basin Property. (PSR ¶¶ 7–9; Bachu Trial Tr. 226–27.)

Bical, however, had other plans. As he explained in phone calls intercepted by law enforcement pursuant to a judicially authorized wiretap, Bical did not want GM to "know his business," and he wanted to obtain the GM funding without disclosing the information GM sought. (PSR ¶ 9; Bachu Trial GX-103, GX-104). Bical's solution was to create a justification for not sharing information with GM, specifically by claiming that he

---

[1] In October 2018, the Court held a three-day jury trial on the charges against Bical's co-defendant Darmin Bachu after which Bachu was acquitted of the charges in the Indictment. The transcript of that trial is cited herein as "Bachu Trial Tr. __" and the government's exhibits from the trial are cited as "Bachu Trial GX-__." A district court may consider testimony from related trials—like Bachu's—even if the defendant was not present at those trials, as long as the defendant has an opportunity to respond to such evidence. See United States v. Tracy, 12 F.3d 1186, 1203 (2d Cir. 1993); see also United States v. Sisti, 91 F.3d 305, 312 (2d Cir. 1996) ("The sentencing court's discretion is largely unlimited either as to the kind of information [it] may consider, or the source from which it may come" (alteration in original; internal quotation marks omitted)).

had a non-disclosure agreement ("NDA") with the EDC.  As Bical informed Bachu in a recorded call, Bical had falsely told GM he had a non-disclosure agreement ("NDA") with the EDC that would not allow him to provide GM with the information it sought.  (PSR ¶ 9; Bachu Trial GX-104.)

Bical had no NDA, but having made that representation to GM, he needed to ensure GM believed he had one.  So he enlisted Bachu to help fabricate a fictitious NDA to provide to GM.  (PSR ¶ 9; Bachu Trial GX-104.)  In a recorded call, Bachu confirmed they would "make one [NDA] up right away," which he would later send to Bical's email account.  (PSR ¶ 9; Bical Trial GX-104.)  Thereafter, Bical told the GM representative negotiating the transaction that Bical had showed another GM representative a copy of the false NDA.  (PSR ¶ 9; Bical Trial GX-106.)  With those representations about an NDA in hand, GM subsequently moved forward with the transaction and mailed Bical a "Letter of Intent," listing the terms of its continued negotiations with Bical.  (PSR ¶ 11; Bachu Trial Tr. 230–231.)

The investigation into Bical's scheme revealed other lies Bical told to GM and provided some insight into what Bical planned to do with the GM funding once he received it.  Specifically, in addition to relying on Bachu to craft a fake NDA, Bical also asked Bachu to craft a false lease letter Bical wanted to send to GM.  As captured in recorded phone calls, Bical and Bachu worked to craft a letter that would falsely make it appear to GM that other purchasers were eager to lease the Mill Basin Property from Bical and thereby stymie GM's plans to build a new dealership on the property.  (Bachu Trial GX-107.)  Bical planned to use the letter to falsely claim that Bachu represented two institutional clients who were interested in using the Mill Basin Property.  (Bachu Trial GX-107.)  In fact, however, Bachu did not represent any clients who wanted to use the Mill Basin property.  Bical specified the falsehoods he wanted the false lease letter to include.  As Bical made clear, he wanted "to give GM an impression" that he had multiple people asking him to develop the property because, according to Bical, GM was "dragging their feet to do the deal."  (Bachu Trial GX-107.)

Additionally, two weeks after Bical's call to the GM representative about the false NDA, intercepted telephone calls show that Bical called an associate (the "Associate") to discuss a plan for using GM funding.  (Bachu Trial GX-110, GX-112.)  Bical and the Associate discussed forming a "corporation" through which Bical and the Associate would bill GM for construction work done at the Mill Basin Property.  (Bachu Trial GX-110.)  Bical told the Associate that "[f]or Flatbush Avenue"—which was the location of the dealership—there would be "like 30–40 million . . . pass[ing] through there."  (Id.)  Bical stated that "whatever [was] extra," the Associate would "just write the check back to [Bical]."  (Id.)  During a follow-up March 13, 2012 call with the Associate, Bical emphasized that he and the Associate needed to form the corporation and "do it right."  (Bachu Trial GX-112.)  Bical explained that the Associate would "be the . . . primary of the corporation," which, would allow them to "bill everything passing through there."  (Id.)  Although Bical was to be directly involved in the plan with the Associate, Bical made clear that when they structured this "corporation," he wanted to ensure that "if GM ever does an

3

audit, I don't want it to come back to me, you know?" (Id.)  Tellingly, Bical told the Associate that with the plan he and the Associate were discussing, they could "fuck [GM] right back."  (Id.)

On March 27, 2012, Federal Bureau of Investigation ("FBI") special agents met with Bical and asked about his efforts to obtain the GM funding.  (PSR ¶ 12.)  Bical told the agents he did not believe he had an NDA with the EDC and, after hearing his recorded conversation with Bical about the false NDA, stated that he did not want GM to "know his business."  (Id.)  Ultimately, after the FBI informed GM of Bical and Bachu's scheme, GM stopped the transactions and chose not to provide the GM funding to Bical.  (Id.)

On October 25, 2016, a grand jury returned an indictment charging Bical with one count of attempt and conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, one count of mail fraud, in violation of 18 U.S.C. § 1341, and one count of wire fraud, in violation of 18 U.S.C. § 1343.  On October 4, 2017, Bical pleaded guilty to mail attempt and conspiracy to commit mail and wire fraud as charged in Count One of the Indictment. (Min. Entry dated Oct. 4, 2017.)  Following Bachu's acquittal at trial, Bical moved to withdraw his guilty plea.  (ECF No. 83.)  On October 9, 2018, the Court denied Bical's motion.  (Min. Entry and Order dated Oct. 9, 2018.)

II.     The Sentencing Guidelines Range

Consistent with the plea agreement executed by the parties, the government believes the applicable Guidelines range is 0 to 6 months imprisonment, based on the following calculation:

| | |
|---|---|
| Base Offense Level: (§ 2B1.1(a)(1)) | 7 |
| Plus:   Aggravating Role (§ 3B1.1(c)) | +2 |
| Less:  Acceptance of Responsibility: | -2 |
| Total: | 7 |

The Guidelines calculation set forth in the PSR departs from this calculation by removing the two-level reduction for acceptance of responsibility.  (PSR ¶¶ 22–29.)  The PSR cites to Bical's unsuccessful motion to withdraw his guilty plea as the basis for not granting this reduction.  (Id. ¶ 29.)  Although the government believes the Court is free to consider Bical's motion and related arguments in fashioning the appropriate sentence under 18 U.S.C. § 3553(a), the government stands by its plea agreement with Bical and believes a two point reduction for acceptance of responsibility is still warranted given Bical's guilty plea and truthful allocution, which resolved this case short of trial.  Accordingly, the government asks the Court to apply the Guidelines range reflected in the plea agreement of 0 to 6 months.

III.    <u>The Appropriate Sentence</u>

    A.    <u>Legal Standard</u>

In <u>United States v. Booker</u>, 543 U.S. 220, 245 (2005), the Supreme Court held that the Guidelines are advisory and not mandatory. The Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentences, but they may also tailor the sentence in light of other statutory concerns. <u>Booker</u>, 543 U.S. at 220; see 18 U.S.C. § 3553(a). Subsequent to <u>Booker</u>, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to consider them, along with the other factors listed in section 3553(a)." <u>United States v. Crosby</u>, 397 F.3d 103, 111 (2d Cir. 2005). Although the Court declined to determine what weight a sentencing judge should normally give to the Guidelines in fashioning a reasonable sentence, the Court cautioned that judges should not "return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum." <u>Id.</u> at 113.

The Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007) (citation omitted). Next a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the sentencing court] may not presume that the Guidelines range is reasonable. [The sentencing court] must make an individualized assessment based on the facts presented." <u>Id.</u> at 49-50 (citation and footnote omitted).

Section 3553(a) requires a court to consider a number of factors in imposing sentence, including the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the violation, to promote respect for the law, and to provide a just punishment for the violation; and the need for the sentence to afford adequate deterrence to criminal conduct; to protect the public from further crimes or violation of the defendant; and to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner. The court must also consider the kinds of sentences available, the applicable sentencing guideline and pertinent policy statements, and the need to avoid unwarranted sentencing disparities. <u>See</u> 18 U.S.C. § 3553(a)(1)–(6).

    B.    <u>Discussion</u>

As set forth below, considering the factors set forth in 18 U.S.C. § 3553(a), the relevant sentencing factors warrant a sentence within the applicable Guidelines range. In particular, the nature and serious of the offense and its surrounding circumstances along with

5

the need to promote respect for the law and adequately deter other white collar criminals like Bical weigh heavily in favor of a Guidelines sentence.

### 1. Bical's Offense Was Serious

Bical was a successful business owner and sophisticated negotiator who knew how complex negotiations with a company like GM worked. Bical fully understood that before GM would give him $15 million, the company needed total transparency around the acquisition and control of the Mill Basin Property. However, Bical chose to lie and fabricate a false NDA in hopes of getting the money on his terms alone and without handing over the information that GM required to protect its investment in Bical. Bical's crime reflected a pattern of purposeful deception designed to help Bical alone.

This was not hard bargaining; it was fraud. The NDA Bical invented and presented to GM was a lie intended to prevent GM from properly assessing the risks involved in the transactions while still ensuring GM would give Bical the money. Any doubt as to Bical's motives in crafting the false NDA was expelled in light of his entire course of conduct with GM and his other lies and deceptions during their negotiations. That course of conduct included Bical's request for the separate false lease letter from Bachu. It also included Bical's recorded conversations with the Associate, in which he expressed in plain terms a desire to "fuck [GM] right back" through an opaque corporate billing arrangement designed to ensure no GM audit would "come back to [Bical]." Although the specifics of Bical's plan with the Associate were never fully captured over the wiretap, their recorded conversations still underscore Bical's willingness to deceive GM for his own benefit.

To be sure, GM ultimately avoided the greatest financial harm by putting the potential $15 million deal with Bical on hold. However, the more indirect harms caused by Bical's course of conduct should not be ignored in assessing the crime's seriousness. As the Court heard at the Bachu trial, GM hoped to strengthen a mutually beneficial business relationship with Bical and, ultimately, to sell more GM cars. To realize that goal, as the GM witnesses testified at the Bachu trial, GM put significant time, energy and resources into the transaction. In the end, with Bical's years' long relationship with GM and its employees as a backdrop, Bical still chose to defraud them. It was an FBI intervention, not a change of heart by Bical that ensured no greater harm resulted from Bical's crimes.

Accordingly, the nature, seriousness of the Bical's offense weighs heavily in favor of a Guidelines sentence.

### 2. A Guidelines Sentence Would Promote Respect for the Law and Deter Future Actors

A sentence within the applicable Guidelines range is also necessary to ensure respect for the law and to deter others from perpetrating a fraud like Bical's. Here, Bical's crime reflected his fundamental belief that the law applied differently to him. Despite having every opportunity to comply with the same rules every other GM dealer was required to

6

follow, and despite having access to trained legal counsel who could have helped him comply, Bical made a calculated choice to break the law in order to harm GM. A sentence within the Guidelines range would make clear that under our laws, successful business leaders and parties to commercial transactions are held to the same standard as everyone else, and that no actor can lie about material facts to cause harm to another.

The Court's sentence should also further the aims of general and specific deterrence. U.S.S.G. § 3553(a)(2)(B), (C). Here, both are at issue. There is a greater need for general deterrence for fraud schemes than other crimes, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

A Guidelines sentence, which represents a strong but fair sentence by the Court, would send a strong deterrent message to those who engage in similar conduct as Bical that participation in such crimes are serious offenses that come with appropriate consequences.

IV.	Conclusion

        For the reasons set forth above, the Court should impose a sentence within the Guidelines range of 0 to 6 months imprisonment.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:	  /s/Drew G. Rolle
    Drew G. Rolle
    Assistant U.S. Attorney
    (718) 254-6783

cc:	Thomas A. Kenniff, Esq. (by ECF)
    Anthony Colleluori, Esq. (by ECF)
    Bruce Connelly, Esq. (by ECF)
    U.S. Probation Department (by e-mail)